FILED

1 | PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2 | Name  Davis          Trent
   |       (Last)        (First)        (Initial)

3 |

4 | Prisoner Number  P11141

5 | Institutional Address  MCSP P.O. Box 409060 Ione, CA 95640

   | C-13-247

6 |

7 | UNITED STATES DISTRICT COURT
   | NORTHERN DISTRICT OF CALIFORNIA

8 | Trent Davis                              )
9 | (Enter the full name of plaintiff in this action.)   )
   |                                         )
10 |                vs.                      )   CV 08   3056
   |                                         )   Case No.
   |                                         )   (To be provided by the clerk of court)
11 | Mike Martel, Warden                     )
   |                                         )   PETITION FOR A WRIT
   |                Respondent               )   OF HABEAS CORPUS
12 |                                         )
   |                                         )           WHA
13 |                                         )
14 | (Enter the full name of respondent(s) or jailor in this action)  )
15 |                                         )           (PR)

16 |              Read Comments Carefully Before Filling In

17 | When and Where to File

18 |        You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1  Who to Name as Respondent

2         You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11         1. What sentence are you challenging in this petition?

12              (a)    Name and location of court that imposed sentence (for example; Alameda

13                     County Superior Court, Oakland):

14              County Superior Court          San Mateo County

15                     Court                          Location

16              (b)    Case number, if known Superior ct no: SC042645

17              (c)    Date and terms of sentence September 16, 2005    27 years

18              (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                     parole or probation, etc.)          Yes  X     No

20                     Where?

21                     Name of Institution: Mule Creek State Prison

22                     Address: P.O. Box 409060 Ione CA 95640

23         2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Pen code §§664/187 subd(a) §220,288(a) subd(c) §§664/288(a)

27  Pen code §245 subd(a), §236, §12022 subd(b)(1) Prior Convictions

28  Pen code §§1170.12 subd(c)(1), 667 subd(a) §667.5 subd(b)

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1  3. Did you have any of the following?

2      Arraignment:          Yes __X__  No _____

3      Preliminary Hearing:     Yes __X__  No _____

4      Motion to Suppress:     Yes __X__  No _____

5  4. How did you plead?

6      Guilty _____  Not Guilty __X__  Nolo Contendere _____

7      Any other plea (specify) _____

8  5. If you went to trial, what kind of trial did you have?

9      Jury __X__  Judge alone _____  Judge alone on a transcript _____

10  6. Did you testify at your trial?     Yes _____  No __X__

11  7. Did you have an attorney at the following proceedings:

12      (a)  Arraignment     Yes __X__  No _____

13      (b)  Preliminary hearing    Yes __X__  No _____

14      (c)  Time of plea     Yes __x__  No _____

15      (d)  Trial     Yes __x__  No _____

16      (e)  Sentencing     Yes __X__  No _____

17      (f)  Appeal     Yes __X__  No _____

18      (g)  Other post-conviction proceeding  Yes __X__  No _____

19  8. Did you appeal your conviction?    Yes __X__  No _____

20      (a)  If you did, to what court(s) did you appeal?

21      Court of Appeal     Yes __X__  No _____

22      Year: _7/12/2007_  Result: _Judgement affirmed_

23      Supreme Court of California  Yes __x__  No _____

24      Year: _9/19/2007_  Result: _Denied Review_

25      Any other court     Yes _____  No __X__

26      Year: _____  Result: _____

27

28      (b)  If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS   - 3 -

1             petition?               Yes __X__   No_____

2       (c)      Was there an opinion?      Yes __X__     No_____

3           (d)      Did you seek permission to file a late appeal under Rule 31(a)?

4                              Yes_____      No_____

5              If you did, give the name of the court and the result:

6                                   _____ N/A _____

7                                   _____

8  9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9  this conviction in any court, state or federal?      Yes __X__     No_____

10         [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition. You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15  U.S.C. §§ 2244(b).]

16       (a)      If you sought relief in any proceeding other than an appeal, answer the following

17              questions for each proceeding. Attach extra paper if you need more space.

18          I.      Name of Court: _____ N/A _____

19                  Type of Proceeding: _____ N/A _____

20                  Grounds raised (Be brief but specific):

21                  a._____ N/A _____

22                  b._____

23                  c._____

24                  d._____

25                  Result: _____ N/A _____ Date of Result: _N/A_

26          II.      Name of Court: _____ N/A _____

27                  Type of Proceeding: _____

28                  Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - 4 -

            2004 Supp. App. 14 B p 28 c

1        a._____

2        b._____

3        c._____N/A_____

4        d._____

5        Result: _____Date of Result:_____

6     III.    Name of Court: _____

7        Type of Proceeding: _____

8        Grounds raised (Be brief but specific):

9        a._____

10       b._____N/A_____

11       c._____

12       d._____

13       Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15       Type of Proceeding: _____

16       Grounds raised (Be brief but specific):

17       a._____

18       b._____N/A_____

19       c._____

20       d._____

21       Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                     Yes _____    No __X__

24      Name and location of court: _____

25 B. GROUNDS FOR RELIEF

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27 support each claim. For example, what legal right or privilege were you denied? What happened?

28 Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS     - 5 -

1    need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: _____

6    _____ See Attached _____

7        Supporting Facts: _____

8    _____

9    _____

10   _____

11       Claim Two: _____ See Attached _____

12   _____

13       Supporting Facts: _____

14   _____

15   _____

16   _____

17       Claim Three: _____ See Attached _____

18   _____

19       Supporting Facts: _____

20   _____

21   _____

22   _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____ N/A _____

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  _____See Attached_____

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes_____     No_X__

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _6/16/08_____                    _____

14              Date                                    Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

Trent Davis P11141
Mule Creek State Prison
P.O. Box 409060
Ione, CA 95640 C-13-247

    Petitioner Pro-Se

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Trent Davis,** )<br>        Petitioner, )<br>vs )<br>         )<br>**M. Martel, Warden,** )<br>        Respondent, ) | CASE NO: A111960<br>San Mateo County No: SC042645<br><br>**PETITION FOR WRIT OF HABEAS CORPUS<br>UNDER 28 U.S.C. § 2254** |

TO THE DISTRICT COURT JUDGES IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

    I Trent Davis, Hereafter petitioner, request this court in the above styled cause, to grant this writ of habeas corpus to secure uniformity of decision and to settle important questions of law. Questioning the constitutionality of propensity evidence in sex offense cases. [Is] it a violation of petitioner's Fourteenth Amendment right to due process where alleged "propensity" evidence of a wholly dissimilar prior sexual offense is used against petitioner in a current sexual offense prosecution lacking relevance?

    [Is] petitioner denied his Sixth Amendment right to a defense and his Fourteenth Amendment right to due process, if the jury is

i

1  not permitted to hear relevant evidence about numerous and
2  baseless prior criminal complaints (against other persons), made
3  out by the witness complaining against him, when the facts
4  underlying those prior baseless complaints go directly to
5  impeaching the credibility of that complaint? (Propensity
6  Evidence)?

7       [Is] it a violation of petitioner's Sixth Amendment right to
8  a jury trial for a court at the time of sentencing to aggravate a
9  presumptively-appropriate middle term of imprisonment to an upper
10 term, based on its own findings that petitioner , served a prior
11 prison term, was on parole at the time of the offenses, and  had
12 adult convictions of "increasing seriousness." "violent conduct,"
13 and that petitioner is a danger to society. (The jury made no
14 such factual findings).

15
16  _6/16/08_
     /Date
17
18                              Respectfully Submitted
19                              _____
20                              Trent Davis
                               Petitioner Pro-Se
21
22
23
24
25
26
27
28

                          ii

1  Northern District Case No: _____

8              IN THE UNITED STATES DISTRICT COURT
9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 Trent Davis,              )    CASE NO: A111960
              Petitioner,  )              SC042645
11                           )
   vs                        )
12                           )
                             )
13 M. Martel, Warden,        )
              Respondent,   )
14 _____  )

15            Memorandum of Points and Authorities

                           iii

1

## Issues Presented

2

3

4

5                                    I

6       PETITIONER WAS DENIED HIS FEDERAL
        CONSTITUTIONAL RIGHTS TO DUE PROCESS
7       AND FAIR TRIAL UNDER THE FOURTEENTH
        AMENDMENT WHEN THE TRIAL COURT ADMITTED
8             "PRIOR BAD ACT EVIDENCE"

9

10

11

12                                  II

13
        PETITIONER WAS DEPRIVED HIS SIXTH
14      AND FOURTEENTH AMENDMENT RIGHTS TO
        PRESENT A DEFENSE AND DUE PROCESS
15      WHEN THE TRIAL COURT PRECLUDED THE
        DEFENSE FROM IMPEACHING DOUKAS
16

17

18

19

20                                 III
        PETITIONER WAS DENIED HIS SIXTH
21      AMENDMENT RIGHT TO JURY TRIAL
              AT TIME OF SENTENCING
22

23

24

25

26

27

28

                                    iv

1

## Table of Authorities

2

### Federal Cases

3  Ake v Oklahoma (1985) 470 US 68, 74 [105 S.ct. 1087] ······· pg 16

4  Arizona v Fulminante 499 US 279, 307 ···················· pg 20
5  113 ·ed 2d 302, 111S.ct. 1246

6  Blakely v Washington (2004) 542 US 296 ·················· pg 22
   [124 S.ct. 2531]

7  Boyd v California 494 US 370, 380 ······················ pg 15
8  108 Led 2d 316 110 S.ct. 1190

9  Chambers v Mississippi (1973) 410 US 284 ··············· pg 20
10 310 [93 S.ct. 1038]

   Chapman v California 368 US 18, 24,17 Led 2d ·········· pg 17, 21
11 705, 87 S.ct. 824

12 Cooper v Aaron (1958) 358 US 1, 18 ···················· pg 16

13 Cunningham v California (2007) [127 S.ct. 856] ········ pg 22, 23

14 Davis v Alaska (1974) 415 US 308, ····················· pg 20
15 316 [94 S.ct. 1105]

16 Delaware v Van Ardall (1986) 475 US 673, ·············· pg 20
   679 [106 S.ct. 1431]

17
   Estelle v Mc Guire 502 US 62, 116 ··················· pg 14, 18
18 Led 2d, 385 112 S.ct. 475

19 Fay v Noia supra at 440-441 9 Led ····················· pg 20
20 2d 837 83 S.ct. 822

21 Hewitt v helms 459 US 370, 380, ······················ pg 15
   103 S.ct. 864 (1983)

22 Hicks v Oklahoma 447 Us 343 ·························· pg 15
23 100 S.ct. 2227

24 James v Illinois (1990) 493 US 307 ··················· pg 22
   [110 S.ct. 648]

25
   Kotteakos v United States 328 US 750, 776, ·········· pg 18, 19
26 90 Led 15557, 66 S.ct. 1239

27 Shepard v United States (2005) 544 US 13, ············· pg 23
   [125 S.ct. 1254]
28

v

United States ex rel Durso v Pate 426, ·················· pg 16
F2d 1083, 1086 (7th cir 1970)

United States ex rel Palmer v De Robertis 738 F2d ········· pg 16
168, 170 (7th cir 1984) 496 US 924, 105 S.ct.

Washington v Texas (1967) 388 US 14, 19 ·················· pg 21
[87 S.ct. 1920]

Williams v Taylor (2000) 529 US 420 ·················· pg 18, 23
146 Led 2d 435, 120 S.ct. 1479

### State Cases

People v Britt (2002) 139 Cal App 4th ·················· pg 16
500, 505

People v Walker (2006) 139 Cal 4th 782 ·················· pg 16
796-797

Del-Monte v Wilson (1992) 1 Cal 4th ·················· pg 16

**US Constitutional Amendments**

Fourteenth, Sixth, Fifth Amendments

**Penal Codes**

§ 664/187, sund(a), § 662/288(a), § 245 subd(a), § 236

§ 12022, subd(b)(1), § 1170.12 subd(c)(1) 667, subd(a)

§667.5 subd(b), §1108 subd(a), §1101

## Statement of the Case

Defendant was convicted following a jury trial of attempted murder (pen. code, § 664/187, subd.(a) assault with intent to commit forcible oral copulation (pen. code §662/288a), three counts of assault with a deadly weapon (pen. code §245, subd(a)) and false imprisonment (pen. code §236), with associated enhancements for personal use of a deadly weapon (pen. code §12022, subd.(b)(1).[1] The trial court subsequently found that defendant suffered prior convictions (pen. code §1170.12, subd.(c)(1), 667, subd.(a), and served a prior prison term (pen. code § 667.5 subd.(b). He was sentenced to an aggravated term of 27 years in state prison.

[1] Petitioner was previously convicted of the same offenses, the judgement was affirmed by this court, but reversed by the ninth circuit court of appeal in a habeas corpus proceeding. The convictions currently on appeal before us followed a retrial of the charges.

1

**STATEMENT OF FACTS**

2  **The Charged Offenses**

3      The victim of the charged offenses, Tamara,[1] joined friends

4  at Molloy's bar in Colma at about 9:00 p.m. on December 18,1997,

5  to play a "trivia game." The trivia game ended between 10:00

6  and 11:00 p.m., whereupon Tamara and her friends went to the

7  Burlingame Station bar in Burlingame between 11:00 and 11:30

8  p.m. to play pool. Tamara left her car at Molloy's bar. After an

9  hour or more at Burlingame Station, Tamara noticed a friend,

10  John Patterson, the manager of the Fish Market restaurant where

11  she formerly worked. Patterson introduced Tamara to his friend,

12  defendant. Patterson convinced Tamara to meet him and defendant

13  at another bar a few blocks away known as "the Tavern" when she

14  finished her pool game.

15      Tamara walked to the Tavern to join Patterson and defendant.

16  They talked there for 10 to 15 minutes before Tamara mentioned

17  that she "should get back" to her friends at Burlingame Station.

18  Patterson and defendant then walked with Tamara back to

19  Burlingame Station, wher they discovered the bar was closed and

20  her friends were gone. Patterson offered to drive Tamara "home,"

21  but suggested they first visit a nearby candy store he owned

22  with his sister. At the store they ate candy, and at Patterson's

23  suggestion Tamara took two "Beanie Babies." Defendant "grabbed a

24  whole bunch" of Beanie Babies and put them in a bag.

25      After 30 minutes to an hour in the candy store, they took a

26  cab to a liquor store to purchase alcohol. They returned to the

27  candy store for a while, then Patterson drove them to his house

28  [1] For the sake of confidentiality, we refer to the victim of the
charged offensesand the victims of the prior uncharged acts by
their first names

1

1  in Belmont. Tamara " really wanted to go home," but Patterson

2  insisted that she "hang out" with them and "go to his house for a

3  little bit." Tamara was reluctant, but "felt really guilty" after

4  eating candy and taking Beanie Babies from Patterson, so she

5  agreed. Patterson was aware that Tamara did not have cab fare. He

6  offered to give her "money to take a cab home" from Belmont to

7  her car in Colma.

8      They arrived at Patterson's home around 2:30a.m. Tamara "kept

9  saying" that she was "really cold, tired, wanted to go home," but

10  she did not want to immediatly insist that Patterson call a cab

11  for her. Defendant offered Tamara his sweatshirt, which she

12  accepted. She spoke with defendant, who mentioned that he "had a

13  nine-year-old boy and a ten-year-old girl." He also "said he was

14  a model for Playgirl" magazine. After one of patterson's roommates

15  began angrily "screaming and yelling and swearing" that they "were

16  making a lot of noise," Tamara "just really wanted to go home."

17  She "was afraid of the roommate," and waited by the door until

18  she could leave.

19      Finally, Tamara "firmly" told Patterson, "I really want to go

20  home; I need a cab." Patterson called a cab, which arrived at his

21  home 15 minutes later, about 4:00a.m. He also gave Tamara $20 for

22  cab fare, and asked her not to tell defendant that he "gave this

23  to her." Tamara intended to take the cab directly to her car

24  parked in Colma. As she "said goodbye and turned to the door,"

25  however defendant asked if he could "share a cab" with her.

26  Tamara agreed, as defendant lived in San Mateo, so "it was right

27  along the way" to Colma. Tamara testified that both Patterson and

28  defendant had been "very polite, very nice" during the evening,

1    although they both, and Patterson in particular, did not seem to

2    want her to leave.

3        Tamara and defendant rode in the cab to defendant's house in

4    San Mateo. They both thought the cab driver acted "really

5    strange" during the cab ride; he did not respond to anything

6    Tamara said. Although Tamara planned to have the cab driver leave

7    defendant at his home and continue alone in the cab to Colma,

8    defendant repeatedly mentioned that he had a "cab driver friand"

9    who could drive her to her car. When they arrived at defendant's

10   house, he forcefully reiterated that the cab driver was "very

11   strange" and unsafe. He suggested that Tamara come inside, where

12   he offered to call his friend to pick her up. Tamara "trusted"

13   defendant, who "was very polite" all evening, and thought his

14   suggestion was a "far better alternative" to continuing the ride

15   with a cab driver who "didn't listen to anything" she said.

16       They arrived at defendant's house, which he occupied with his

17   children and a roommate. Defendant awakened his two children who

18   were sleeping on the sofa in the living room, and directed them

19   to a bedroom. At tamara's request, defendant then appeared to

20   place a telephone call to a cab company. Tamara noticed that

21   defendant did not give his address during the conversation, but

22   defendant explained, "he's my friend , he knows where I live."

23   While Tamara waited for the cab , they sat on the couch.

24   Defendant talked "about his modeling career" and displayed

25   photographs of himself and his family. When defendant began to

26   show her nude photographs of himself from Playgirl magazine she

27   "thought he was a little perverted," but still "didn't think he

28   was any danger" to her.

                                   3

1    After at least 20 minutes passed, Tamara said "I'm going to

2    call a cab." Defendant replied "no, I'll go ahead and call my

3    friend again." After ostensibly making another call to the cab

4    company defendant told Tamara "there was an accident, and the

5    cab driver would arrive in "five or ten" minutes. Tamara "settled

6    bck down" and fell asleep while seated on the couch.

7        When Tamara awoke, she found the defendant "completely

8    naked," sitting on her , "and he was masturbating." Defendant

9    declared, "suck my cock." When Tamara refused, defendant grabbed

10   a black baton, held it over her head, and clenched his jaw.

11   Tamara replied, "okay okay, okay, I'll do whatever you want."

12   Defendant put the baton down and said, "put it in your mouth."

13   Tamara pretended to be agreeable. She told defendant, "first, I

14   have to use the bathroom and take care of some things, and then I

15   can have sex with you." She hoped to "run away" if defendant

16   allowed her to get up from the couch. When defendant lifted some

17   of his weight from her, Tamara "slipped out from beneath his

18   legs" to run for the door.

19       As Tamara attempted to escape, defendant grabbed her and

20   ripped off her sweater and shirt. Tamara found herself on her

21   hands and knees on the floor. Defendant jumped on her back and

22   flattened her face down on the floor. He put a plastic bag on her

23   face as he pushed her against the floor so she could not move.

24   Tamara could not breathe through the plastic, although she kept

25   "thashing and fighting." She began "losing consciousness," and

26   thought she "was dying." She "couldn't move" her hands , and

27   "tried laying still." Finally, Tamara "just thrashed really hard

28   one more time," and managed to momentarily get the bag away from

4

1   her mouth to take a breath.

2       Defendant replaced the bag on Tamara's mouth, and with one

3   hand tried to wrap a cord around her throat or face. Tamara was

4   able to free one of her hands and pull the plastic bag away from

5   her mouth so she could get another breath. She also screamed as

6   loud as she could. Defendant continued to push the plastic bag

7   against her mouth and "tighten the cord" around her neck.

8       Defendant's roommate Charles Renfroe ran into the room.

9   Tamara testified that Renfroe hollard at defendant, "you have to

10  stop doing this. you can't keep doing this. you néd to let her

11  go." Defendant answered: "[S]he's just a hooker that I picked up.

12  She wants me to do this to her. Go back to bed, Charles." Tamara

13  screamed to Renfroe, "it's not true," and implored him not to

14  leave her.

15      Renfroe again told defendant to "let her go." When defendant

16  did not respond, Renfroe attempted to pull defendant away from

17  Tamara. As they struggled on the floor Renfroe again pled with

18  defendant, "Let this one go." Defendant yelled to Renfroe: "It's

19  too late. Go back to bed. It's too late . She'll go to the cops.

20  I have to finish." Defendant continued to hold Tamara by the head

21  and pin her to the ground. During the struggle they rolled into

22  the Christmas tree and the packages under it were strewn about.

23  Defendant had Tamara's hair "balled up in his hand."

24      Defendant's daughter Amanda then entered the room and

25  exclaimed, "I'm going to call 911"[2] Defendant told her "do not

26  call 911. If you love your daddy, you will go back to bed. Do not

27  call 911. Daddy is just playing." Tamara spoke to Amanda; her

28  [2] The testimony of defendant's daughter and son presented ot the
    first trial was read into the record in the second trial.

5

voice sounded "scary and shaky." Amanda also observed Renfroe attempting to pull defendant "off the girl" and telling defendant "just let her go."

After defendant told Amanda to go to her bedroom, she left the living room briefly. She and defendant's son Dustin returned to the living room about five minutes later and screamed at defendant to "stop." Tamara was still "trying to get away" from defendant. Amanda once more threatened to "call 911" unless defendant released Tamara. She left the room and called 911 to report that "a guy and girl were struggling in the living room." Renfroe also told defendant, "I am going to call 911," and "got up" from the floor.

Defendant began pushing Tamara so hard that she thought her "neck would be broken any second." Tamara begged Renfroe not to leave her. Renfroe "came back over and tried to pull [defendant] off some more." "there was silent fighting for a long time" before Renfroe again commanded defendant to "let her go." Defendant repeated: "She'll go to the cops. It's too late. I can't. I have to finish." Tamara promised not to "go to the cops."

Defendant suddenly "stopped struggling," "let go," and said "it's over." Tamara pulled away from defendant, ripping her hair out of his hand as she did so. She grabbed her purse and other belongings as Renfroe opened the front door and screamed to her, "just get out of here while you can." Tamara leapt through the door and ran away. She noticed the address of defendant's house and name of the street as she ran, and "kept saying it over and over" to remember it.

6

1    Within a few minutes, Tamara stopped a passing tow truck
2    driver and used his cell phone to call 911. In the call she
3    stated that a man named "Trent" had tried to "rape and kill" her.
4    Tamara mentioned that the defendant have given her a "drug to put
5    me out." She also expressed concern for the safety of Renfroe.
6    Tamara made a second 911 call shortly thereafter for fear that
7    defendant might "turn on" Renfroe and the children because they
8    "witnessed something really bad" and "tried to help" her. She
9    later called Patterson to tell him defendant had "tried to kill"
10   her and direct him not to give defendant "any information" about
11   her.

12        Once Tamara was gone, defendant told his son and daughter
13   that she had held a "knife to his throat," beaten him with a
14   pool cue, tried to handcuff him, and demanded money from him. He
15   gave a "long black stick" to Amanda and told her to take it to
16   his room. Amanda also took a "romance tape" out of the VCR which
17   had been playing when she came into the room, and later gave it
18   to police.

19        After Tamara fled from the house, Renfroe began
20   "hyperventilating" and had pain in his chest, so he went to his
21   bedroom to rest. By the time the police arrived at defendant's
22   house 10 minutes later - just before 6:15a.m. - Renfroe had
23   "calmed down." Renfroe described the incident to the police,
24   although he was concerned about defendant's welfare and did not
25   then disclose that defendant had been prosecuted in New York for
26   sexual assault a year and a half before.

27        Tamara was transported to San Mateo Police Department. The
28   officer who interviewed her noticed that her clothing was

                                    7

"disheveled," her hair was "messed up," and she was "clearly upset." Her gums were cut, her lips were swollen, and she had dried blood on the corners of her mouth.

From the police station, Tamara was transported to the hospital, where a sexual assault examination was performed. When she arrived Tamara was "tearful and emotional and upset." She had scratches on her face and her lips were "very crusted over with blood." She complained of neck and nasal pain, and "was basically sore all over." Blood was found on her underwear that was consistant with defendant's genetic markers, but not positively identified - except that Tamara was excluded as the donor. Blood stains were detected on both the inside and outside of her sweater: those on the inside were consistent with Tamara's type; those on the outside were consistent with defendant's type. No sperm was found on her body or clothes.

A search of defendant's residence was undertaken later that day. A black billy club was found on the floor of a closet and a pool cue was discovered in a bedroom. Three plastic bags smeared with saliva were seized. A clump of hair was recovered from the living room floor near a coffee table. Nude and partially clothed photographs of defendant, along with an adult video and magazines, were also collected from the house.

Defendant was taken into custody and interviewed at the police station. Cut or bite marks were observed on the middle fingers of both hands. he also had a bite mark on his left forearm and scratches on his right shoulder and chest. Blood was visible on his middle right finger. Defendant stated he called Luxor Cab Company for Tamara three times from his house, but the

8

1   dispatch records for the company did not indicate any calls for
2   service from the defendant's neighborhood after midnight.
3   **The Victim's Prior Report of an Assault**
4       During her cross-examination Tamara also testified about a
5   police "report of assault and battery" she filed with the
6   Millbrae Police Department in February of 1997. The complaint
7   recited periodic physical abuse of Tamara by her boyfriend Scott
8   W. during the course of their year and a half relationship. Late
9   in 1995, W. became "mildly abusive" with Tamara. In March of
10  1996, according to the report, W. pushed her down and punched her
11  after she said she was "leaving" him. Tamara also reported
12  additional incidents of physical violence by W. directed at her
13  that occurred in November and December of 1996, including
14  throwing her against a wall, pulling her hair, slapping her face,
15  shaking her neck, and bruising and biting her arms. In January of
16  1997, W. slashed the tire of her friend's car. None of the
17  incidents reported by Tamara involved sexual assault, attempted
18  suffocation, or weapons.
19      Tamara was interviewed by a police officer, but W. was never
20  charged for any criminal offenses described in the report due to
21  "late reporting"and lack of corroborating witnesses. Tamara was
22  urged to obtain a restraining order.
23  **The Prior Sexual Assault of Kimberly**
24      Kimberly testified that she met defendant while she was at
25  the Limelight Club in Manhattan with two friends on the night of
26  April 17, 1996. After a couple of hours at the Limelight Club,
27  Kimberly, her two friends and defendant left in Kimberly's car.
28  Defendant did not express any romantic or sexual interest in

1   Kimberly. She dropped off her two friends on the way to her home
2   in Rockaway. Defendant then lamented that he was alone in New
3   York City and had no place to stay. Kimberly "felt bad" for
4   defendant and agreed to let him sleep on a couch in the living
5   room. Kimberly retired to her bedroom to sleep, and closed the
6   door.

7       While Kimberly was "half asleep" defendant appeared in her
8   bedroom and said he was "going to rape" and kill her. Defendant
9   "looked evil." Kimberly was "scared," but decided to "fight
10  back." Defendant pinned her on the bed, and began to strangle her
11  with his hands around her neck. He tried to force his penis into
12  her mouth, but she resisted. Defendant then flipped Kimberly onto
13  her stomach and wrapped a belt around her neck until she passed
14  out. Kimberly thought she "was going to die." When she awoke she
15  was naked on her stomach, with defendant on her back. She tried
16  to escape, but defendant pulled her back onto the bed and again
17  began to strangle her with his hands. Kimberly struggled free and
18  ran into the living room. Defendant followed her into the living
19  room and apologized. He said he thought she "would like it like
20  that." Kimberly told defendant to leave. When he asked her to
21  return to the bedroom with him, she grabbed a dress from the sofa
22  and ran out of the house to her neighbor's residence, where she
23  called the police. Defendant was charged with the offenses
24  committed against Kimberly, but found not guilty after trial.
25  **The Prior Sexual Assault of C.**

26      C. was married to defendant for approximately one year
27  beginning in 1996. In 1997, they lived in San Mateo with Charles
28  Renfroe and defendant's two children. In October of 1997, their

10

1  relationship ended and C. moved out of the residence to a house
2  she shared with friends. C. told defendant that she "wanted a
3  divorce." Defendant "wanted to try to work it out," and was very
4  upset.

5      C. visited defendant's house at his request one night in
6  December of 1997. No one else was there. Defendant stated that
7  "he needed to talk" with her. He was "obviously intoxicated," and
8  told C. that he still wanted to reconcile. She said "no." C.
9  followed defendant from the living room into the bedroom as they
10 continued their conversation. They "hugged" and "kissed" at
11 defendant's instigation, but C. felt "a bit uncomfortable" and
12 "started to push away" from him. Defendant closed the bedroom
13 door and told C., "you're not going anywhere." Defendant began
14 kissing C. "more aggressively" and thrust his pelvis against her
15 as she continued to push against his chest. C. said "stop, Trent,
16 what are you doing. I don't want to do this."

17     After a "couple minutes" of "groping," defendant exclaimed,
18 "I'm horny and I want to fuck you." C. reiterated that she did
19 not "want to do this," where upon defendant became "very angry."
20 He unbuttoned her pants and pushed her hard to the ground.
21 Defendant continued to remove C.'s clothes despite her pleas to
22 stop. With C. on her back, defendant pushed down on her shoulder
23 with one hand, and with the other squeezed her throat until she
24 had difficulty breathing. Defendant forcibly "inserted his penis"
25 and engaged in sex with C., then he turned her over on her
26 stomach, held her by the back of the neck, and "began to have sex
27 with [her] again." C. continued to plead with defendant to stop,
28 but he did not respond. Defendant abruptly "stopped what he was
                                11

doing and rolled over onto his back." C. "got up immediately and pulled [her] pants back on." She told defendant he was "really sick" and needed help, then left the house without interference from defendant.

C. testified that she did not report the incident to the police because she "was embarrassed" and "didn't understand what had just happened." She also thought the police would not believe an accusation that her husband raped her. After C. learned that defendant was accused of the sexual assault of Tamara in December of 1997, during questioning by the police she still did not reveal his assault of her. Instead, she stated that defendant was never physically violent with her. She "still loved" defendant and "wanted to protect him." She also feared retaliation from him. C. disclosed the assault to friends in 1998, but did not testify against defendant in his first trial. She told the district attorney's office for the first time during the interview on August 24, 2005, that defendant had raped her. C. testified that she finally disclosed the rape because she "needed to tell the truth," and "couldn't lie anymore."[3]

**The Defense Case**

The defense presented testimony from Tamara's former boyfriend Scott W. in which he claimed that he never physically abused Tamara. He denied all of the acts of "assault and battery" that Tamara reported to the police. W. admitted that he punctured the tires of a car owned by Tamara's friend after he learned Tamara "had a relationship" with him.

Renfroe testified for the defense that he did not hear

[3] The prosecution presented expert opinion testimony on rape trauma syndrome, particularly to account for the delay in disclosure of the incident by C.

12

defendant refer to Tamara as a "hooker" during the struggle. Nor did he hear defendant say "it's too late" and "I need  to finish this," as Tamara testified. Instead, he heard defendant proclaim that Tamara took his wallet, and she replied "that's not true." Renfroe further testified thhat he did not say to defendant, "you can't keep doing this anymore." He only kept pleading with defendant "to stop." Renfroe did not see a billy club, plastic bags or a cord during the struggle in the living room. He also denied that he opened the front door for tamara to leave; rather, she did that herself.

13

1

<u>ARGUMENT</u>

2

I

3
4
5

PETITIONER WAS DENIED HIS FEDERAL
CONSTITUTIONAL RIGHTS TO DUE PROCESS
AND FAIR TRIAL UNDER THE FOURTEENTH
AMENDMENT WHEN THE TRIAL COURT ADMITTED
"PRIOR BAD ACT EVIDENCE."

6       The prosecution was allowed to present evidence of an

7  uncharged, alleged 1997 sexual assault by petitioner on his

8  then-estranged (now former) wife, Casey Scott, as well as

9  evidence of a claimed sexual assault in New York on Kimberly

10  O'Brien, for which petitioner had been charged , tried, and

11  <u>acquitted</u>. Petitioner argues, the trial court erred in admitting

12  the prior bad acts evidence, as the admission of that evidence

13  unduly prejudiced petitioner exceeding the bounds of reason in

14  an arbitrary manner that resulted in a manifest miscarriage of

15  justice. Petitioner relies on <u>Estelle v McGuire</u> 502 US 62, 116

16  Led 2d, 385 112 S. ct 475. In which the United States Supreme

17  Court ruled that a finding of guilt based simply on a judgement

18  that the accused had committed the prior bad acts and therefore

19  had a "propensity" to commit that type of crime in conjunction

20  with the current offense rendered the accused's trial arbitrary

21  and fundamentally unfair in violation of the due process clause

22  of the Fourteenth Amendment (emphasis 902 F2d 749). In the

23  instant case, by the trial court allowing the evidence, the

24  jury(in mind) <u>authorized</u> the use of "propensity evidence." By

25  doing so, this may have relieved the prosecution of it's burden

26  as required (fair trial) to prove guilt beyond a reasonable

27  doubt. To reiterate the law, a simple plea of (not guilty)

28  mandates the prosecution to prove <u>all</u> the elements of the crime

14

1  charged. See <u>Boyd v California</u> 494 US 370, 380, 108 Led 2d 316

2  110 S. ct 1190. In which a determination of guilt or innocence is

3  exclusively for a jury, given the necessary evidence <u>legally</u>

4  sufficient to sustain a conviction unaffected by error (emphasis

5  added).

6      The prosecution introduced evidence of prior acts to

7  establish that petitioner has a "propensity" for a certain type

8  of behavior. The trial court incorrectly admitted the evidence

9  pursuant to California law. See <u>Hewitt v Helms</u> 459 US 460, 466

10 [103 S. ct 864 1983] quoting.

11                 "while <u>no</u> state may deprive any person
                   of life, liberty or property, without
12                 due process of law, liberty interest
                   protected by the Fourteenth Amendment
13                 may arise from two sources - the due
                   process clause itself and the law of
14                 the states"

15     Petitioner was deprived of his liberty interest "without a

16 hearing," and the arbitrary deprivation of a purely state law

17 entitlement violates the federal due process clause applicable

18 to the states through the Fourteenth Amendment. See <u>Hicks v</u>

19 <u>Oklahoma</u> 447 US 343 [100 S. ct 2227]. However; the state argues

20 that the general rule prohibiting evidence of prior acts of

21 misconduct to prove predisposition or propensity, in 1995 the

22 legislature enacted section 1108 authorizing in sexual cases the

23 admission of evidence of the defendant's other sexual offenses.

24 Quoting " In a criminal action in which the defendant is accused

25 of a sexual offense, evidence of the defendant's commission of

26 another sexual offense or offenses is not made inadmissible by

27 section 1101, <u>if</u> the evidence is not inadmissible pursuant to

28 section 352 (§ 1108, subd.(a). Relying on <u>People v Walker</u>(2006)

                                    15

1  139 CalApp 4th 782, 796-797. " By removing the restriction on

2  character evidence in section 1101, section 1108 now permits the

3  jury in sex offense cases to consider evidence of prior offenses

4  for any relevant purpose, [subject] only to the prejudicial

5  effect versus probative value weighing process required by

6  section 352. " People v Britt (2002) 104 Cal. App. 4th 500, 505.

7  The state court's rational fails badly under the supremacy

8  clause of the United States Constitution which requires Supreme

9  Court precedent to prevail over a state court's contrary opinion

10  (US Const, art, vi, cl 2; Del Monte v Wilson (1992) 1 Cal 4th 1009,

11  1023; Cooper v Aaron (1958) 358 US 1, 18.)

12  It is evident that the admission of prejudicial and

13  irrelevant evidence violated petitioner's Fourteenth Amendment

14  rights and this court must determine whether the probative value

15  of the evidence outweighed the prejudice to petitioner. See

16  United States ex rel Durso v Pate 426 F2d 1083, 1086 (7th cir

17  1970).

18  The tendency of propensity evidence to 'overpersuade' the

19  jury is beyond dispute and habeas must issue, when an erroneous

20  evidentiary ruling "is of such magnitude that the result is a

21  denial of fundamental fairness." United States ex rel Palmer v De

22  Robertis 738 F 2d 168, 170 (7th cir 1984) 469 US 924, 105 S. ct

23  306, 83 Led 2d 241 and "falls outside the bounds of reason." The

24  evidence improperly admitted referred not to evidence that proves

25  guilt, but to evidence that prompted an emotional reaction

26  against petitioner and caused the trier of fact to decide the

27  case on an improper basis, thus maximizing the risk the jury

28  would be motivated to punish petitioner for the uncharged

16

offense; and whether the "propensity evidence" of uncharged acts
is stronger or more inflammatory than the evidence of the case in
chief, resulting in the criminal convictions. The question before
this court is whether the state met it's burden of proving
(without error) beyond a reasonable doubt? The state's references
to "propensity evidence" were frequent and such references were
in effect cumulative. The states evidence of guilt was not
overwhelming or especially substantial. That combined with the
egregious trial error that infected the integrity of the
proceedings influencing the jury's verdict. The Supreme Court has
long determined federal habeas corpus relief must be granted to a
state prisoner on the ground of federal constitutional "trial
error" that is, an error that occurred during the presentation of
the case to the jury, and that may be quantitatively assesed in
the context of other evidence presented in order to determine the
effect that the error had on the  trial. The appropriate harmless
error standard to apply is whether the error had substantial and
injurious effect or influence in determining the jury's verdict,
[rather] than whether the error was harmless beyond a reasonable
doubt, because the substantial-effect standard is better taylored
to the nature and purpose of collateral review, and because
application of the less onerous substantial-effect standard ( in
such cases) promotes the consideration underlying the United
States Supreme Court's federal habeas corpus jurisprudence.

The state supreme court has upheld the harmless error beyond
a reasonable doubt set forth in Chapman v California 386 US 18,
24 17 Led 2d 705, 87 S. ct 824. However; The federal courts
disagreed, holding that the proper standard of harmless-error

17

1  review was set forth in <u>Kotteakos v United States</u> 328 US 750,

2  776, 90 Led 15557, 66 S. ct 1239, i.e., whether the "propensity

3  evidence" violation "had substantial and injurious effect or

4  influence in determining the jury's verdict." In this case the

5  trial court's erroneous application "propensity evidence" was the

6  kind of clear misapplication of state law that denies petitioner

7  his federal due process rights. And where, as here, the admission

8  of prejudicial evidence is sufficiently inflammatory that it

9  prevents a fair trial, due process again is offended. Petitioner

10  relying on <u>Estelle v McGuire</u>(1991) 502 US 62, 75 [12 S.ct 465].

11  The state court's decision was contrary to long standing

12  constitutional law as determined by the US Supreme court and the

13  states analysis is an erroneous application of US Supreme court

14  precedent. See <u>Williams  v  Taylor</u>, wherefore petitioner's

15  convictions must be reversed.

16

17

18

19

20

21

22

23

24

25

26

27

28

18

## II

**PETITIONER WAS DEPRIVED OF HIS SIXTH
AND FOURTEENTH AMENDMENT RIGHTS TO
PRESENT A DEFENSE AND DUE PROCESS
WHEN THE TRIAL COURT PRECLUDED THE
DEFENSE FROM IMPEACHING DOUKAS**

The court erred and abused its discretion in refusing to allow the defense to introduce potentially impeaching evidence about Doukas's "propensity" (propensity evidence) for filing police complaints against domestic partners, roommates, neighbors, and total strangers; more particularly, the court erred in precluding the defense from introducing information about Doukas's other complaints of sexually abusive behavior by a complete stranger. For had the jury heard about all these complaints by Doukas (and not just about her complaint against Walen), the jury would have questioned whether Doukas exaggerated some of her perceived grievances with others, which was a defense theory about what happened in this case (see R.T.6, p. 296, and R.T.13, pp 1671, 1680-81, 1683-84).

Petitioner argues, his ability to impeach Doukas's credibilty was hampered by the courts ruling, he was deprived of his Sixth Amendment right to present a full defense and of his Fifth Amendment right, applicable to the state through the Fourteenth Amendment, to due process, resulting in which the United States Supreme Courts have characterized as "trial error." See Kotteakos v United States 328 US 750, 776, 90 Led 1557, 66 S. ctl239 (1946) emphasis added. Quoting "such error occurs during the presentation of the case to the jury, and is amenable to harmless error analysis because it may be quantitativly assessed in context of the other evidence to determine its effects on the

19

1  trial." see Arizona v Fulminante, 499 US 279, 307, 113 Led 2d

2  302, 111 S. ct 1246. In keeping with convictions that violate

3  fundamental fairness, the court must afford relief to those

4  persons whom the state has grievously wronged in light of modern

5  justice and to guard against extreme malfunctions in the state

6  criminal justice systems. (Quoting Fay v Noia supra at 440-441 9

7  Led 2d 837 83 S.ct 822).

8      Under the due process clause any relevant evidence offered

9  must be admitted in a criminal proceeding. Evidence of matters

10 which have "any tendency in reason" to prove or disprove the

11 truthfulness of a witness's testimony are fully admissable.

12     Thus,under the confrontation clause of the Sixth Amendment to

13 the United States constitution secures a defendant's right to

14 cross-examine prosecution witnesses. See Davis v Alaska(1974) 415

15 US 308, 316 [94 S.ct 1105]. Although the confrontation clause

16 does not guarantee unbounded scope in cross-examination, it does

17 guarantee an "opportunity" for effective cross examination. See

18 Delaware v Van Ardall(1986) 475 US 673, 679 [106 S.ct 1431]

19 emphasis added, Central to the confrontation clause is the right

20 of a defendant to cross-examine a witness's credibility. Davis v

21 Alaska supra 415 US at 316. The United States Supreme court has

22 found a trial court's refusal to permit a defendant to inquire

23 into and rely on similar matters to be federal constitutional

24 error requiring reversal. See Chambers v Mississippi(1973) 410 US

25 284, 310 [93 S.ct 1038]. The principle federal constitutional

26 provisions affected by erroneous exclusion of evidence are a

27 defendant's Sixth Amendment right to present a defense (Ake v

28 Oklahoma(1985) 470 US 68, 74 [105 S.ct 1087]), and his Fifth

20

1   Amendment right to due process, both of which are applicable to
2   the states through the Fourteenth Amendment. (Ibid; <u>Washington v</u>
3   <u>Texas</u>(1967) 388 US 14, 19 [87 S.ct 1920]. As a result, the court
4   erred under federal constitutional law when it excluded from
5   trial evidence about other police reports, particularly as the
6   underlying claim in one report was that three complete strangers
7   assaulted her, when she was alone at night, and that they
8   committed acts suggestive of sexual assault.

9   **In Retrospect**

10      Petitioner argues this case involves fundamental defects and
11  omissions inconsistant with the rudimentary demands of fair
12  procedure. Of particular importance, are the long standing
13  commitment to fairness as represented by a "scale" or "scales of
14  justice." Which is a weighing instrument or system. In a court of
15  law the <u>evidence</u> presented tilts the scales regardless of the
16  inherent prejudicial quality of the evidence itself. The trial
17  court allowed "propensity evidence" for the state <u>then</u> exceeded
18  the bounds of reason by rejecting the counterbalance of
19  "propensity evidence" for the defense. Thus slanting the scales
20  and relieving the state of its burden as required. In truth
21  federal constitutional error has occurred, and "the burden"
22  shifts to the state to prove beyond a reasonable doubt that the
23  errors did not contribute to the verdict obtained. (<u>Chapman v</u>
24  <u>California</u>(1967) 386 US 18, 24 [87 S.ct 824]. Proper application
25  of the <u>Chapman</u> standard requires a finding that the error in this
26  case in <u>no</u> way contributed to the verdict, a burden the state
27  will be unable to sustain.

28      For the ruling in this case did not further the truth-seeking

21

1  function of petitioner's trial, the importance of which
2  repeatedly has been exhorted by the United States Supreme court.
3  See, eg. <u>James v Illinois</u>(1990) 493 US 307 [110 S.ct 648].

4      Wherefore petitioner prays for reversal of petitioner's seven
5  counts of conviction.

6
7
8
9

10                      **III**

11          **PETITIONER WAS DENIED HIS SIXTH**
            **AMENDMENT RIGHT TO JURY TRIAL**
12          **AT TIME OF SENTENCING**

13 <u>Lastly</u>

14     Not withstanding the principles of <u>stare decisis</u> and the
15 United States Supreme Court's decisions in <u>Cunningham v</u>
16 <u>California</u>(2007) _____ US _____ [127 S.ct 856] and <u>Blakely v</u>
17 <u>Washington</u>(2004) 542 US 296 [124 S.ct 2531], [is] it a violation
18 of petitioner's Sixth Amendment right to a jury trial for a court
19 at the time of sentencing to aggravate a
20 presumptively-appropriate middle term of imprisonment to an
21 upper-term, based on its own findings that petitioner, served a
22 prior prison term, was on parole at the time of these offenses,
23 and had adult convictions of " increasing seriousness", and that
24 the facts of this case disclose "violent conduct" and that
25 petitioner is a "danger to society", when the jury was not asked
26 to, nor did it, make any such <u>factual findings</u>?

27 <u>Issue</u>

28     Petitioner recognizes the recent decisions in <u>Black</u> and

                    22

1 Snadoval established that (at this time), in California, the
2 right to a jury trial does not apply to the aggravating factor of
3 "numerous" or "increasingly serious" prior convictions, and that
4 there is no Sixth Amendment violation so long as the sentencing
5 court relied on at least one "valid" aggravating factor, such as
6 this "prior conviction" exception.

7   But the United States Supreme court itself has cautioned that
8 the "fact of a prior conviction" exception should be read
9 narrowly. (Citing) Shepard v United states (2005) 544 US 13 [125
10 S.ct 1254].) Therefore, for purposes of federal review (in the
11 event petitions for certiorari are filed and granted in either
12 Black or Sandoval.) There is a clear conflict between the state
13 supreme court and pronouncements of the United States Supreme
14 court on the constitutionality of sentencing proceedings. In
15 Cunningham itself, the high court declined to draw a distinction
16 between offense-related aggravating circumstances and
17 Offender-related ones. Cunningham vCalifornia supra _____ US
18 127 S.ct 856, 869 at fn.14.

19

20                              **CONCLUSION**

21   Petitioner has developed his claims in state court and has
22 proved the state court's decision was "contrary" to and involved
23 "unreasonable application" of, clearly established federal law,
24 as determined by the supreme court of the United States. See
25 Williams v Taylor (2000) 529 US 420 146 Led 2d 435, 120 S.ct 1479.
26 For the foregoing reasons petitioner, (Trent Davis), respectfully
27 requests this court grant federal habeas corpus relief of the
28 issues set forth and make a decision on the merits after a full
                              23

1 | DE Novo review based on the instant arguments.

2

3 | _____
        Date
4

5

6

7

8 |                                        Respectfully Submitted

9

10 |                                _____

11 |                                     Trent Davis
                                         Mule Creek State Prison
12 |                                      P.O. Box 409060-9000
                                         Ione, CA 95640-9000
13 |                                      Petitioner Pro-Se

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    24

UNITED STATES DISTRICT COURT

**NORTHERN** · DISTRICT OF CALIFORNIA

Trent Davis

Plaintiff or Petitioner

v.

Case Number:

Mike Martel, Warden

Defendant or Respondent

_____ /

I hereby certify that on _____ , 20 __ , I served a copy

of the attached   Petition for writ of habeas corpus under 28 USC §2254

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope

in the United States Mail at Mule Creek State Prison .

(List Name and Address of Each
Defendant or Attorney Served)

Clerk for the United States District Court
for the Northern District of California
450 Golden Gate Avenue, Box 39090
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Name of Person Completing Service)



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE®
Label 107, February 2006
www.usps.com

RECEIVED

JUN 19 2008

MAGISTRATE JUDGE
WILLIAM ALSUP/EDW. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Clerk of the United States District
Court of the Northern District of
California
450 Golden Gate Avenue
Box 36060
Francisco, CA 94102

U.S. POSTAGE
PAID
FOSTER CITY,CA
JUN 19, '08
AMOUNT
$4.80
J0US3032-09