**FILED**

MAY 1 8 2010

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRENT DAVIS,<br><br>    Petitioner,<br><br>  v.<br><br>MIKE MARTEL, Warden,<br><br>    Respondent.               / | No. C 08-3056 WHA (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This is a habeas case filed pro se by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted based on the three claims in the petition. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner has filed a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

In 1998, petitioner was charged with attempted murder (Cal. Pen. Code §§ 187(a), 664); assault with intent to commit forcible oral copulation (Cal. Pen. Code §§ 220, 288a(c)); attempted forcible oral copulation (Cal. Pen. Code §§ 288a, 643), three counts of assault with a deadly weapon (Cal. Pen. Code § 245(a)), and false imprisonment (Cal. Pen. Code § 236). Petitioner also faced allegations of using a deadly weapon (Cal. Pen. Code § 12022(b)(1)), and of having suffered three prior convictions and one prior prison term (Cal. Pen. Code §§ 1170.12(c)(1), 667.5(b)). He was convicted of these charges and the allegations were found true,



and the judgment was affirmed on direct appeal. However, a conditional writ of habeas corpus was issue in federal district court because a faulty instruction issued pursuant to the version of CALJIC No. 2.50.02 in effect at that time. The writ allowed the state to retry petitioner, and petitioner received a second trial in 2005 on the same charges. The jury convicted him again of all charges at the second trial, and found true the allegations that petitioner used a deadly weapon (Exh. A at 466-67, 476-79). Petitioner waived his right to a jury trial on the allegations regarding the prior convictions and prison term, and the trial court found them to be true (*id.* at 466-68). The trial court sentenced him to a term of 27 years in state prison (*id.* at 583-84).

On July 12, 2007, the California Court of Appeal affirmed the conviction and sentence (Exh. E). The California Supreme Court denied petitioner's petition for review on September 19, 2007 (Exh. G). Petitioner filed the instant federal habeas petition on June 23, 2008.

The following background facts describing the crime are from the opinion of the California Court of Appeal (Exh. E at 1-7).

The victim of the charged offenses, Tamara, was with friends at a bar on the evening of December 18, 1997, in Burlingame, California, when she noticed a friend, John Patterson. Patterson introduced Tamara to his friend, petitioner. Patterson offered to drive Tamara "home," but suggested they first visit a nearby candy store he owned with his sister. After going to a liquor store a bit later, Patterson drove them to his house in Belmont at around 2:30 a.m.. Although Tamara kept saying she wanted to go home, it was not until around 4:00 a.m. that Patterson called her a cab

Tamara and petitioner shared a cab ride. They agreed to drop petitioner at his house first and then go to Tamara's car. Because the cab driver was acting "really strange," however, Tamara accepted petitioner's offer to get out at his house where he would call a friend who drove a cab to pick her up. At petitioner's house, he woke up his two children, ages nine and ten, who were sleeping on a sofa in the living room, and directed them to a bedroom. At Tamara's request, petitioner appeared to call a cab twice but none came. While they waited for the cab on the couch, petitioner showed her nude photographs of himself from Playgirl magazine. She "thought he was a little perverted," but still "didn't think he was any danger" to her because he had been

2

"polite" all evening. After Tamara requested the cab again, he appeared to call a cab again, and while waiting, she fell asleep while seated on the couch.

When Tamara awoke, she found petitioner "completely naked," sitting on her, "and he was masturbating." Defendant declared, "Suck my cock." When Tamara refused, petitioner grabbed a black baton, held it over her head, and clenched his jaw. She pretended to acquiesce, and he put the baton down and said, "Put it in your mouth." Tamara pretended to be agreeable and told petitioner, "first I have to use the bathroom and take care of some things, and then I can have sex with you." When petitioner lifted some of his weight from her, Tamara "slipped out from beneath his legs" to run for the door.

As Tamara attempted to escape, petitioner grabbed her and ripped off her sweater and shirt. Petitioner jumped on her back and flattened her face down on the floor. He put a plastic bag on her face as he pushed her against the floor so she could not move. Tamara could not breathe through the plastic, and she began "losing consciousness" and thought she "was dying." Petitioner also tried to wrap a cord around her throat or face. Tamara fought back and managed to get a breath and scream. Petitioner's roommate, Charles Renfroe, ran into the room. Tamara testified that Renfroe hollered at petitioner, "You have to stop doing this. You can't keep doing this. You need to let her go." Petitioner answered: "[S]he's just a hooker that I picked up. She wants me to do this to her. Go back to bed, Charles." Tamara screamed to Renfroe, "it's not true," and implored him not to leave her. Renfroe tried to pull petitioner away from Tamara, and pled with petitioner, "Let this one go." Petitioner yelled to Renfroe: "It's too late. Go back to bed. It's too late. She'll go to the cops. I have to finish."

Petitioner's children entered the room and screamed.[1] Petitioner ordered them to leave and told his daughter not to call the police because he was "just playing." His daughter observed Renfroe attempting to pull petitioner "off the girl" and telling petitioner "just let her go." Tamara was still "trying to get away" from petitioner. His children told petitioner to stop or they would call 911, and eventually his daughter called 911 to report that "a guy and girl were struggling in the living room."

---

[1]Petitioner's children's testimony from the first trial was read to the jury at the second trial.

3

Petitioner began pushing Tamara so hard that she thought her "neck would be broken any second." Tamara and Renfroe continued to fight "for a long time," until suddenly petitioner let go and said "it's over." Tamara pulled away from petitioner, ripping her hair out of his hand, and she grabbed her things and ran outside. She noticed the address of petitioner's house and name of the street as she ran, and "kept saying it over and over" to remember it. She stopped a passing tow truck and used his cell phone to call 911. She stated that a man named "Trent" had tried to "rape and kill" her, and he may have given her a "drug to put me out."

Once Tamara was gone, petitioner told his son and daughter that she had held a "knife to his throat," beaten him with a pool cue, tried to handcuff him, and demanded money from him. He gave a "long black stick" to his daughter and told her to take it to his room. Renfroe described the incident to the police when they arrived, although he was concerned about petitioner's welfare and did not then disclose that petitioner had been prosecuted in New York for sexual assault a year and a half before.

Tamara was transported to the San Mateo Police Department. The officer who interviewed her noticed that her clothing was "disheveled," her hair was "messed up," and she was "clearly upset." Her gums were cut, her lips were swollen, and she had dried blood on the corners of her mouth. From the police station, Tamara was transported to the hospital, where a sexual assault examination was performed. Tamara was "tearful and emotional and upset." She had scratches on her face and her lips were "very crusted over with blood." She complained of neck and nasal pain, and "was basically sore all over ." Blood was found on her underwear that was consistent with petitioner's genetic markers, but was not positively identified-except that Tamara was excluded as the donor. Blood stains were detected on both the inside and outside of her sweater: those on the inside were consistent with Tamara's type; those on the outside were consistent with petitioner's type. No sperm was found on her body or clothes.

A search of petitioner's house later that day uncovered a black billy club, a pool cue, three plastic bags smeared with saliva, a clump of hair, and nude and partially clothed photographs of petitioner. Petitioner was arrested and interviewed at the police station. He had cut or bite marks on his fingers and forearm, scratches on his shoulder and chest, and blood on

4

1  his middle finger. While petitioner stated that he called the Luxor Cab Company for Tamara
2  three times from his house, dispatch records showed no such calls.

3　　　　During her cross-examination Tamara also testified about a police "report of assault and
4  battery" she had previously filed in February 1997 in which she complained of periodic physical
5  abuse of Tamara by her boyfriend Scott W. during their eighteen-month relationship. She
6  reported numerous incidents of physical violence by W. directed at her, including throwing her
7  against a wall, pulling her hair, slapping her face, shaking her neck, and bruising and biting her
8  arms. Tamara was interviewed by a police officer, but W. was never charged for any criminal
9  offenses described in the report due to "late reporting" and lack of corroborating witnesses.
10 Tamara was urged to obtain a restraining order.

11　　　　The defense presented testimony from Scott W. in which he claimed that he never
12 physically abused Tamara. He denied all of the acts of "assault and battery" that Tamara reported
13 to the police, admitting only that he punctured the tires of a car owned by Tamara's friend after he
14 learned Tamara "had a relationship" with him. Renfroe testified for the defense that he did not
15 hear petitioner refer to Tamara as a "hooker" during the struggle. Nor did he hear petitioner say
16 "it's too late" and "I need to finish this," as Tamara testified. Instead, he heard petitioner proclaim
17 that Tamara took his wallet, and she replied, "That's not true." Renfroe further testified that he
18 did not say to petitioner, "you can't keep doing this anymore." He only kept pleading with
19 petitioner "to stop." Renfroe did not see a billy club, plastic bags or a cord during the struggle in
20 the living room. He also denied that he opened the front door for Tamara to leave; rather, she did
21 that herself.

## ANALYSIS

### A.　STANDARD OF REVIEW

24　　　　A district court may not grant a petition challenging a state conviction or sentence on the
25 basis of a claim that was reviewed on the merits in state court unless the state court's adjudication
26 of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable
27 application of, clearly established Federal law, as determined by the Supreme Court of the United
28 States; or (2) resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

**B.   ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner asserts that: (1) his due process rights were violated by the trial court's admission of evidence of his prior sexual assaults; (2) his Sixth

6

and Fourteenth Amendment rights were violated by the trial court's refusal to allow certain impeachment evidence; and (3) the imposition of the upper term at sentencing based on facts not found by the jury violated his due process rights.

### 1. Admission of Evidence

Petitioner claims that the trial court violated his right to due process by admitting overly prejudicial evidence of petitioner's prior sexual assaults pursuant to California Evidence Code Section 1108. Section 1108 provides, in relevant part: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The evidence of petitioner's prior sexual assaults admitted at trial was described by the California Court of Appeal as follows:

**The Prior Sexual Assault of Kimberly**

> Kimberly testified that she met defendant while she was at the Limelight Club in Manhattan with two friends on the night of April 17, 1996. After a couple of hours at the Limelight Club, Kimberly, her two friends and defendant left in Kimberly's car. Defendant did not express any romantic or sexual interest in Kimberly. She dropped off her two friends on the way to her home in Rockaway. Defendant then lamented that he was alone in New York City and had no place to stay. Kimberly "felt bad" for defendant and agreed to let him sleep on a couch in the living room. Kimberly retired to her bedroom to sleep, and closed the door.
>
> While Kimberly was "half asleep" defendant appeared in her bedroom and said he was "going to rape" and kill her. Defendant "looked evil." Kimberly was "scared," but decided to "fight back." Defendant pinned her on the bed, and began to strangle her with his hands around her neck. He tried to force his penis into her mouth, but she resisted. Defendant then flipped Kimberly onto her stomach and wrapped a belt around her neck until she passed out. Kimberly thought she "was going to die." When she awoke she was naked on her stomach, with defendant on her back. She tried to escape, but defendant pulled her back onto the bed and again began to strangle her with his hands. Kimberly struggled free and ran into the living room. Defendant followed her into the living room and apologized. He said he thought she "would like it like that." Kimberly told defendant to leave. When he asked her to return to the bedroom with him, she grabbed a dress from the sofa and ran out of the house to her neighbor's residence, where she called the police. Defendant was charged with the offenses committed against Kimberly, but found not guilty after a trial.

7

**The Prior Sexual Assault of C.**

C. was married to defendant for approximately one year beginning in 1996. In 1997, they lived in San Mateo with Charles Renfroe and defendant's two children. In October of 1997, their relationship ended and C. moved out of the residence to a house she shared with friends. C. told defendant that she "wanted a divorce." Defendant "wanted to try and work it out," and was very upset.

C. visited defendant's house at his request one night in December of 1997. No one else was there. Defendant stated that "he needed to talk" with her. He was "obviously intoxicated," and told C. that he still wanted to reconcile. She said "no." C. followed defendant from the living room into the bedroom as they continued their conversation. They "hugged" and "kissed" at defendant's instigation, but C. felt "a bit uncomfortable" and "started to push away" from him. Defendant closed the bedroom door and told C., "you're not going anywhere." Defendant began kissing C. "more aggressively" and thrust his pelvis against her as she continued to push against his chest. C. said: "Stop, Trent, what are you doing. I don't want to do this."

After a "couple minutes" of "groping," defendant exclaimed, "I'm horny and I want to fuck you." C. reiterated that she did not "want to do this," whereupon defendant became "very angry." He unbuttoned her pants and pushed her hard to the ground. Defendant continued to remove C.'s clothes despite her pleas to stop. With C. on her back, defendant pushed down on her shoulder with one hand, and with the other squeezed her throat until she had difficulty breathing. Defendant forcibly "inserted his penis" and engaged in sex with C., then turned her over onto her stomach, held her by the back of the neck, and "began to have sex with [her] again." C. continued to plead with defendant to stop, but he did not respond. Defendant abruptly "stopped what he was doing and rolled over onto his back." C. "got up immediately and pulled [her] pants back on." She told defendant he was "really sick" and needed help, then left the house without interference from defendant.

C. testified that she did not report the incident to the police because she "was embarrassed" and "didn't understand what had just happened." She also thought the police would not believe an accusation that her husband raped her. After C. learned that defendant was accused of the sexual assault of Tamara in December of 1997, during questioning by the police she still did not reveal his assault of her. Instead, she stated that defendant was never physically violent with her. She "still loved" defendant and "wanted to protect him." She also feared retaliation from him. C. disclosed the assault to friends in 1998, but did not testify against defendant at his first trial. She told the district attorney's office for the first time during an interview on August 24, 2005, that defendant had raped her. C. testified that she finally disclosed the rape because she "needed to tell the truth," and "couldn't lie anymore."

(Exh. E at 9-11.)

The United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Absent such a ruling from the United States Supreme Court, a federal habeas court cannot find the state

8

court's ruling was an "unreasonable application" of "clearly established federal law" under 28 U.S.C. 2254(d)(1). *Ibid.* (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Under *Holley*, therefore, habeas relief cannot be granted under Section 2254(d)(1) on Petitioner's claims that the admission of overly prejudicial evidence of his prior sexual assaults violated his right to due process. *See id.* at 1101 n.2 (finding that although trial court's admission of irrelevant and prejudicial evidence violated due process under Ninth Circuit precedent, such admission was not contrary to, or an unreasonable application of, "clearly established Federal law" under Section 2254(d)(1), and therefore not grounds for granting federal habeas relief).

Even if federal habeas relief were available on a claim that the admission of overly prejudicial evidence violates due process, the evidence of petitioner's prior sexual offenses caused no such violation. To begin with, the United States Supreme Court has left open the question whether propensity evidence violates due process per se. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right to avoid the admission of propensity evidence is not "clearly established" as required by AEDPA, *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006) (citing 28 U.S.C. 2254(d)(1)), and therefore a state court's rejection of such a claim cannot be grounds for federal habeas relief, *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008). Moreover, the Ninth Circuit has held that the federal evidentiary rule allowing propensity evidence does not violate due process because the evidence of the prior offense still is subject to the trial court's balancing test before it is admitted, which provides meaningful review. *United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001) (addressing Federal Rule of Evidence 414 (allowing evidence of prior sexual offenses to show a propensity to commit the charged sexual offense)). As California's Evidence Code Section 1108 requires a similar balancing test under Section 352, it also does not violate due process.

In any event, the Ninth Circuit's case law on this issue provides that in order to amount to a due process violation, the admission of evidence must be so arbitrary or prejudicial that the trial became fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The admission of the prior sexual assault evidence was not so prejudicial as to render the trial

9

fundamentally unfair. The evidence was substantially probative of the critical issue of whether Tamara's account of the incident was credible. Petitioner's prior sexual assaults had substantial similarities to Tamara's account in that they were committed in residences, the victims were people he knew, he strangled the victim in each case, and in each case he abruptly started and abruptly stopped the assaults. The similarity of petitioner's prior assaults to Tamara's account of petitioner's assault made her account more credible. In addition, the risk of prejudice was mitigated both by limiting instructions as to the proper use of the evidence, which the jury is presumed to follow, *see Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997), and by the fact that the accounts of the prior sexual offenses were, while distressing, not more inflammatory than the detailed and brutal account of the charged crimes.

Under these circumstances, even if habeas relief could be obtained based on a claim that the admission of propensity evidence violated due process, the record indicates no such violation occurred here. Consequently, the state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.

### 2. **Exclusion of Impeachment Evidence**

Petitioner contends that the exclusion of evidence that he would have used to impeach the victim violated his Sixth and Fourteenth Amendment rights to present a defense and to confrontation. The California Court of Appeal summarized the relevant background to this claim as follows:

> Defendant sought to impeach the victim with evidence of four police reports by Tamara during the course of seven years: a complaint in October of 1997, that a neighbor's dog bit her dog on the paw; the report in February of 1997 of W.'s abuse of Tamara and vandalism of her friend's car; a complaint in January of 2003 that a former roommate "impersonated" Tamara and "used her name" to subscribe to products and websites; and a crime report initially made to a police officer by Tamara's friend that Tamara was accosted by three men who grabbed her around the waist and shoulder, and partially unbuttoned her pants.[] The trial court permitted the defense to impeach Tamara with the police report of W.'s abuse of her, but excluded evidence of the other three reported incidents as irrelevant.

(Exh. E at 15-16.)

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal

defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). To determine if the exclusion of evidence violated the defendant's right to present a defense, the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *United States v. Stever*, No. 09-30004, slip op. 6701, 6715 (9th Cir. May 4, 2010) (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).

The Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). To determine whether a defendant's right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).

The excluded evidence of Tamara's prior reports to police of other unrelated crimes was not relevant because there was no evidence suggesting that the reports were false in any way. The defense was allowed to present evidence that Tamara had reported her prior boyfriend, W., assaulted her because the defense also had evidence that could be viewed as showing the report was false, namely W.'s testimony denying the assault. In the absence of any evidence that the excluded reports were false, they did not show that she had any tendency to lie to the police about crimes committed against her, nor did they have any bearing on her credibility as a witness. Rather, the reports simply showed that over the course of approximately seven years she had the misfortune of being the target of other crimes that were unrelated to the crimes charged against petitioner. That Tamara had suffered from other crimes did not make it any more or less likely that petitioner had committed the charged crimes against her.

Without any evidence as to the falsity of the excluded reports, they had no probative value to the issue of her credibility or any other issue at trial, and their exclusion did not violate petitioner's constitutional rights to present a defense or of confrontation. Consequently, the state appellate courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.

### 3. Right to Jury

Petitioner claims that the trial court violated his Sixth Amendment right to trial by jury as set out in *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004), by imposing the upper term of nine years on the conviction for attempted murder in Count 1 based on factors not found by a jury beyond a reasonable doubt. The trial court imposed the upper term sentence pursuant to California Rule of Court 421 after finding the following aggravating factors: petitioner engaged in violent conduct which indicates a serious danger to society; petitioner's prior convictions are numerous and of increasing seriousness; petitioner had served a prior prison term; and petitioner was on parole when he committed the crime (Exh. B at 1817-18; *see* Cal. Rules of Court 4.421(b)(1) -(4)).

In *Apprendi*, the Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 466. In *Blakely*, the Supreme Court explained that "the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303. This means that the "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." *Cunningham v. California*, 127 S. Ct. 856, 868 (2007). In *Cunningham*, the Supreme Court, citing *Apprendi* and *Blakely*, held that California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent that it contravenes "*Apprendi's* bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt.'" *Ibid.* (quoting *Apprendi*, 530 U.S. at 490).

There was no constitutional error in imposing the upper term on the conviction for

attempted murder. The exception to the general rule in *Apprendi* providing that the fact of a prior conviction need not be pleaded in an indictment or proved to a jury beyond a reasonable doubt, applies. *Butler*, 538 F.3d at 643 (citing *Apprendi*, 530 U.S. at 490 and *Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998)). The Ninth Circuit has recognized that "the Supreme Court has not overruled the *Almendarez-Torres* exception for prior convictions" and therefore the "obligation to apply the *Almendarez-Torres* exception [remains] unless and until it is rejected by the Supreme Court." *Butler*, 528 F.3d at 643-44. Here, petitioner was sentenced to the upper term of nine years based on, among other things, his prior conviction for federal bank robbery, and the trial court noted that petitioner had now committed the more serious offense of attempted murder (Exh. B at 1817-18; *see* Cal. Rule Ct. 4.421(b)(2)). Under the exception set forth in *Almendarez-Torres* and *Apprendi* for aggravating factors based upon a prior conviction, the Sixth Amendment did not require that a jury find that petitioner suffered a prior conviction, and the trial court could rely on its own finding of this aggravating circumstance in sentencing petitioner to the upper term.

The fact that the trial court also found additional aggravating circumstances – such as petitioner's status on parole at the time he committed the offense, that he had served a prior prison term, and that he had been convicted of other crimes for which he could have received consecutive sentences – does not alter this conclusion. "[U]nder California law, only one aggravating factor is necessary to set the upper term as the maximum sentence." *Butler*, 528 F.3d at 641. "[I]f at least one of the aggravating factors on which the judge relied in sentencing [petitioner] was established in a manner consistent with the Sixth Amendment, [petitioner's] sentence does not violate the Constitution." *Id.* at 643. Therefore, as it was within the trial court's discretion to sentence petitioner to the upper term based solely upon his prior conviction, petitioner's sentence is constitutional irrespective of "[a]ny additional factfinding" with respect to additional aggravating circumstances. *Ibid.* Because the trial court relied upon at least one factor established in a manner consistent with the Sixth Amendment, the sentence petitioner received did not violate his Sixth Amendment rights.

For these reasons, the state appellate courts' rejection of this claim was not contrary to, or

an unreasonable application of, clearly established United States Supreme Court authority.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: May 17, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.08\DAVIS3056.RUL.wpd